## IN THE CIRCUIT COURT OF
## ST. LOUIS COUNTY, MISSOURI

| | |
|---|---|
| AYSIN KOPARAN, | ) |
| | ) |
| Plaintiff, | ) Cause No.: |
| | ) |
| v. | ) |
| | ) Division: |
| THE BOEING COMPANY, | ) |
| | ) |
| Defendant. | ) JURY TRIAL DEMANDED |
| | ) |
| Serve Defendant's Agent at: | ) |
| | ) |
| CSC Lawyer's | ) |
| Incorporating Co. | ) |
| 221 Boliver St. | ) |
| Jefferson City, MO 63034 | ) |

### PETITION FOR DAMAGES

Plaintiff Aysin Koparan ("Plaintiff" or "Ms. Koparan"), by and through undersigned counsel, for her Petition for Damages, states as follows:

### PARTIES AND VENUE

1. Plaintiff is citizen residing in St. Louis County in the State of Missouri.

2. Defendant The Boeing Company ("Defendant" or "Boeing") is a foreign corporation—headquartered in Arlington, Virginia—registered to conduct business in Missouri.

3. Defendant employed Plaintiff within St. Louis County, where it conducts operations and where the actions giving rise to the instant Petition largely took place.

4. Venue is therefore appropriate in the St. Louis County, including pursuant to Rule 508.010.

5. Plaintiff is timely filing the present action after receiving a Right to Sue notice from the EEOC which was issued June 28, 2024, in accordance with procedural perquisites, upon the filing of a timely Charge of Discrimination on or about November 14, 2023.

6. Defendant is an employer for purposes of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. §§ 2000e *et seq.* ("Title VII") and at all relevant times had fifteen or more employees.

7. Plaintiff demands a trial by jury on all issues so triable in this case.

## FACTS COMMON TO ALL COUNTS

8. Ms. Koparan dutifully and competently served Boeing for 15 years, lastly as Senior Business Operation Lead in St. Louis County, Missouri.

9. Over that decade and a half her performance reviews were routinely stellar—until such time as she began making legally protected complaints in the late summer of 2022 and began taking FMLA leave in 2023.

**Ms. Koparan's Initial Complaints of Sexual Harassment, Which Are Not Remedied**

10. The basis of Plaintiff's first complaint in this timeline stems from an after-hours get together at Cyberg's restaurant on Dorsett Rd. on August 17, 2022. The occasion was an intern leaving the department.

11. A Senior Lead Engineer named Greg Corcoran (who Ms. Koparan did not report to, but was above her in the corporate hierarchy and, upon information and belief, may have had influence on the ultimate decision to terminate her) asked Plaintiff, in front of other employees seated at a table, "*When did you have sex last?"*

12. When Ms. Koparan did not answer, he persisted, next *asking about her first sexual experience*. At this point, Ms. Koparan admonished him, saying "Do not talk to me that way again"—a statement which constituted protected activity.

13. With respect to Plaintiff's relationship with a co-worker, Michelle, Mr. Corcoran also made the sexist comment, "So, what's between the two of you? Are you having a cat fight?" He also added "What's going on between you and your husband?" and "You don't seem like the marrying type."

14. On August 18, 2022, at 9:34 am, Ms. Koparan texted Greg Corcoran:

"***Since you are now sober – I would like to remind you that you asked me at Riley's happy hour "how old I was when I had sex 1st time". Please don't talk to me that way again.*** *I don't know what Michelle said to you or what you said to each other, but I need her to stop that too.*"

15. Mr. Corcoran tacitly acknowledged the behavior, replying:

*"Ok. Sorry*
*I don't talk behind anyone's back*
*Are you off today"*

16. Ms. Koparan weighed the risk of retaliation for making a formal complaint for about a week. Undaunted, Plaintiff decided to go to second-line supervisor of hers—Senior Manager Ryan Taylor—with the information, which was then funneled through Boeing's Ethics system for investigation. She verbally articulated to Mr. Taylor that Corcoran's conduct was sexually hostile/discriminatory/offensive, as well as raising issue of gossip and other concerns.

17. Ms. Koparan had previously complained of sexual harassment, including in 2019 when a manager said, "*I want your tongue in my mouth*"; her experience with the Company was that sexual harassment and discrimination in the "boy's club" of engineers was endemic and that forceful remedial steps were not taken. Rather than face termination (as Plaintiff eventually would) offenders were simply moved around like chess pieces.

18. The demographics at Plaintiff's location skewed decidedly male, and Caucasian.

3

19. Despite the complaints to Mr. Corcoran and Mr. Taylor, in the months that followed, Mr. Corcoran continued to send unwanted texts to Plaintiff, as well as flirtatiously lingered around Ms. Koparan's desk.

20. On August 28, 2022, Mr. Corcoran texted:

> "*Did you by chance get to the Festival of Nations*
> *Thought about you when the picture in the paper was a Turkish booth*"

21. Ms. Koparan did not reply. On September 1, 2022, Mr. Corcoran texted:

> "***One last text.  Are we never going to talk unless it's hello and good morning or work related?***
> ***Work is totally separate.***
> ***I will never mix personal and work***"

22. On September 3, Plaintiff replied:

> *"There are 2 separate relationships- personal and work. You are only WORK.*
> *So, please don't text my personal number, just use work email to communicate.*
> *Thanks"*

23. The texts to Ms. Koporan's personal number then stopped until February 7, 2023, when Mr. Corcoran texted again:

> "*Sorry to text your work phone with personal question but I just wanted to let you know I am praying for your people in turkey*"

24. After that, the personal texts continued, including wishing her Happy Mother's Day and, on June 2, 2023, texting "*I know you hate me but rest assured I continue to pray for you and your entire family*." Further texts are discussed in context below.

25. Ms. Koparan, after her initial complaint to Mr. Taylor, was interviewed by Matt O'Neill in Ethics on September 15, 2022.

26. In a subsequent statement *drafted by Mr. O'Neill*, Plaintiff was asked—on September 27—to walk back that her complaints were related to sexual harassment. In fear for

4

her job and feeling pressure, she did not request an edit to the statement (which was clearly drafted with the intent of avoiding potential liability).

27. However, the fact that she didn't request a modification does not nullify that her initial verbal complaints (including to both Mr. Corcoran, Mr. Taylor, and Mr. O'Neal) implicated sexual harassment, or that the Company was on notice of comments by Mr. Corcoran which were facially sexually offensive and inappropriate and should have been addressed as violations of Boeing policy on sexual harassment, but were not.

### Ms. Koparan's Additional Protected Complaints About Retaliation, *Including Direct Remarks Indicating Retaliatory Animus During a Discussion of Her Performance Review*

28. Immediately after making her sexual harassment complaint, Ms. Koparan began experiencing just the sort of retaliation she feared. She saw work assignments sent to other, less capable employees and she was frozen out of work discussions and participating in meetings. She experienced a palpable change in attitude towards her; before and after making her complaints was day and night in terms of her work experience.

29. It also became clear that Mr. Corcoran was not being discreet regarding the sexual harassment complaint, making it clear that he resented it.

30. Indeed, during the 2022 Christmas party Mr. Corcoran began talking about the complaint bitterly before Mr. Taylor took him outside.

31. Mr. Corcoran felt free to discuss it because the atmosphere that was allowed to persist was hostile towards complaints of harassment by female employees, who were expected to "go along and get along" with the "boy's club" atmosphere.

32. It was widely known that Plaintiff had dared to make a complaint against Mr. Corcoran, which had an adverse effect on how she was treated and perceived in the workplace.

5

33. In early 2023, Plaintiff sent an email to in Human Resources representative Erica Phillips (with whom Mr. Taylor was close and *had commented to Ms. Koparan that he had "a crush" on her*), making a protected complaint about retaliation at the hands of Mr. Taylor.

34. There was acknowledgment of the complaint but no remedial steps were taken.

35. In January-February 2023, Ms. Koparan received her first negative annual review in her 15-year career at Boeing, which was then followed by a conversation (upon Ms. Koparan's repeated requests) some time later. From this performance review meeting, direct evidence of retaliatory animus emerges:

*36.* During the performance review meeting, *Mr. Taylor complained that the Ethics review was taking too much of his time, was impacting his job performance, and that also he "wasn't able to talk to" Plaintiff because of the Ethics investigation (which wasn't in fact the case).*

37. Mr. Taylor said Plaintiff did good work but added she *"slowed (him) down"* due to the Ethics complaint. (Senior Leader Jordan Woodward was present during this meeting.)

38. The conversation centered decidedly upon the impact of the harassment complaint on Ryan Taylor, who had given Ms. Koparan the lowest ratings he could, resulting in a direct impact upon her bonus and her career prospects going forward.

39. Following that protected complaint, the amount of work Ms. Koparan was given continued to dissipate and her efforts to apply for other internal positions were thwarted. Any attempt at a lateral move or promotion seemed blocked.

6

40. Following the meeting, Mr. Woodward and Ms. Koparan had discussions about Ms. Koparan making further complaints about the review and the conversation that followed, as well as a complaint about being improperly denied overtime pay under the FLSA.

41. Ms. Koparan did in fact make good faith, and therefore protected, complaints to Mr. Woodward about being improperly denied overtime.

42. Mr. Woodward discouraged Ms. Koparan from making such complaints, including via text, where he urged her to read the book *Don't Sweat the Small Stuff*, implying that she was indeed 'sweating small stuff' with respect to her potential and past complaints and should not be making them.

43. Personal texts from Mr. Corcoran in the time leading up to termination included on June 3, 2023 asking if she was "popping into work" when she had taken FMLA leave. Ms. Koparan replied:

"*No. Will be on leave and most likely won't even have a job soon. Pretty much was told to find another job … Ryan pretty much gave me a bad performance review and took my work from me and gave it to someone else. Double retaliation…*"

44. Mr. Corcoran replied:

"*You can have my job.*"

45. Plaintiff then asked if he had gotten any written corrective action, to which he replied

"*No. Someday we will talk(.) Did you get one(?) I would so love to get together and talk when you get yourself together*"

46. Ms. Koparan then mentioned going to Ryan about Michelle, who was raised in connection with the comments at Cyberg's. Mr. Corcoran then replied:

"***You just said something that solved the puzzle for me***" (reply from Ms. Koparan)

7

"*That you told him about our conversation*" (reply from Ms. Koparan)

"*That I asked when you first had sex*" (reply from Ms. Koparan)

"I guess you told him more!!" (reply from Ms. Koparan)

"*We really need to get together and clear the air!*" (further discussion, including Ms. Koparan stating, "Jordan is nice to me, but I can see the pressure of Ryan telling him to get rid of me(.) They have the power to get rid of me")

"*Would you mind sharing your address*" (Ms. Koparan asks why.)

"*Perhaps I want to send something kind*(.) *I would never show up without being invited*." (Ms. Koparan stated "You don't have to do that and I am sure you are not crazy (enough) to show up at my door")

"*I know better than to show up at your door you will shoot me*! *lol*"

47. Mr. Corcoran was continuing unwanted and flirtatious texting (which Ms. Koparan rejected) and was also concerned that she had made a complaint about his sexual comments and was motivated to exert influence to make sure she was terminated.

### Expressed Animosity Towards Ms. Koparan Based on Her National Origin/Ethnicity

48. There was also expressed hostility in the workplace on the basis of race, ethnicity, and national origin towards Ms. Koparan, who is Turkish.

49. Mr. Taylor, on multiple occassions, derided Ms. Koparan's accent/pronunciation of words and made pointed comments, in circa August of 2022, about a trip he had made to India, stating that he was treated "like a God" there because he's white and that he found the country "disgusting" and "dirty and poor."

50. And, as revealed by texts discussed above, Ms. Koparan's nationality/ethnicity was foremost on the mind of Mr. Corcoran.

51. Plaintiff did not formally complain about these comments because she was fearful of retaliation but was troubled by them and perceived that her national origin and ethnicity might make her job security more fragile.

### **Leave from Work to Care for Disabled Immediate Family Members**

52. During 2023, Ms. Koparan was also taking time away from work to care for disabled family members—her daughter, afflicted with depression, made two suicide attempts within three months and her husband was diagnosed with Stage IV terminal cancer.

53. Leading up to her termination, she utilized two blocks of FMLA leave to care for her family members.

54. This appeared to contribute to her ongoing isolation at work.

### **Plaintiff's Termination**

55. In September, 2023 Ms. Koparan was notified that she was being terminated and that the close of the month would be her separation date.

56. Conversely, Mr. Corcoran's career was thriving.

57. No convincing legitimate, non-discriminatory reason for termination has been articulated.

58. At all times, Plaintiff's work performance met or exceeded the reasonable expectations of her employer.

59. Plaintiff never received any prior discipline prior to making protected complaints.

### **Plaintiff's Whistleblowing Activity**

60. One of Plaintiff's tasks while I was working for Ryan Taylor was reporting safety and quality metrics concerning repairing aircraft parts, both military and commercial.

61. Plaintiff became Midwest Subject Matter Expert on this topic and was at an advanced level of data collection & interpretation.

62. Almost all teams, including Ryan's team of engineers worked on quality failures on multiple aircraft.

63. Quality failures in aircraft parts were not being reported, or being drastically underreported.

64. As engineers worked and clocked in programs, these were not accurately being reported to a quality monitoring/reporting tool.

65. Plaintiff repeatedly requested Taylor and the team to submit the work correctly, because they were not capturing and reporting correctly.

66. Plaintiff raised this serious safety issue to Taylor and his manager Craig Bomben.

67. Taylor and Bomben were observably bothered Plaintiff bringing up the issue and refused to take action on Plaintiff's complaints.

68. Quality failures could negatively impact Taylor and Bomben's bonuses.

69. Plaintiff's complaints were above and beyond her normal job responsibilities.

70. Plaintiff's verbal complaints continued until within weeks of her termination.

**Plaintiff's Damages, Generally**

71. As a consequence of Defendant's actions as described herein, Plaintiff has experienced emotional distress, embarrassment, and a loss of reputation.

72. As a consequence of Defendant's actions as described herein, Plaintiff has incurred, and will continue to incur, attorney's fees, costs, and expenses.

73. As a consequence of Defendant's actions as described herein, Plaintiff has suffered lost wages and will continue to suffer lost wages.

74. Defendant's conduct was outrageous due to their evil motive and reckless disregard for Plaintiff's rights thereby entitling her to punitive damages in an amount that will punish Defendant and will deter Defendant and others from like conduct.

## **COUNT I – RETALIATION, IN VIOLATION OF TITLE VII**

75. Plaintiff incorporates by reference the above paragraphs as if fully set forth herein.

76. Plaintiff's protected activity of complaining about sex harassment and sex discrimination, as described herein, was a motivating factor in her termination.

77. The purported reasons for Plaintiff's termination were not based in fact and were pretext for unlawful retaliation.

78. Plaintiff reported the reported the harassment and wrongful and retaliatory conduct committed by her co-workers, supervisors, and others, however, nothing was done to stop the ongoing harassment, intimidation, and retaliation.

79. Plaintiff further reported ongoing retaliation as a result of those complaints of harassment and retaliation.

80. Defendant, by the actions described herein, retaliated against Plaintiff due to her protected activity by terminating her employment.

81. A causal connection exists between Plaintiff's termination and her protected activity.

82. Defendant further failed to consider Plaintiff for transfer, promotion or reassignment in retaliation for her protected activity.

83. The Defendant's behavior violated 42 U.S.C. § 2000e-3.

WHEREFORE, Plaintiff requests a jury trial and that this Court enter judgment in her favor and against Defendant, declaring that Defendant has engaged in unlawful employment practices with respect to Plaintiff in violation of her rights protected by the Title VII; that Plaintiff be

11

reinstated and compensated for all losses and damages suffered as a result of Defendant's unlawful discharge, including, but not limited to, past and future lost income, hedonic damages, emotional distress damages, other lost financial benefits of employment, and an amount to compensate Plaintiff for any tax treatment of a damages award (if reinstatement is not a practical or possible remedy then front pay should be awarded); that Defendant be ordered to pay punitive damages; that Plaintiff be awarded pre-judgment and/or post-judgment interest on her damages; that Plaintiff be awarded attorneys' fees and costs reasonably expended on this case; and further relief as this Court deems appropriate under the circumstances.

### COUNT II – HOSTILE WORK ENVIRONMENT BASED ON SEX, IN VIOLATION OF TITLE VII

84. Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

85. Plaintiff was subjected to unwelcome harassment, as set forth herein.

86. Plaintiff's sex, female, was the cause of the harassment.

87. The harassment was severe and pervasive, both objectively and subjectively, and impacted Plaintiff's terms and conditions of employment.

88. Defendant knew or should have known of the discrimination against Plaintiff as alleged above but failed to implement prompt and effective remedial action.

89. The sexually hostile environment was an ongoing/continuing violation, which extended until the end of Plaintiff's employment by virtue of the ongoing retaliation against Plaintiff in her terms and conditions of employment.

WHEREFORE, Plaintiff respectfully requests judgement, pursuant to verdict by jury, in her favor in an amount that is fair and reasonable for actual damages, punitive damages, emotional

distress damages, interest on damages, for her attorney's costs and fees, and for such other and further relief to which the Court deems just and proper.

### COUNT III – SEX DISCRIMINATION, IN VIOLATON OF TITLE VII

90. Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

91. Plaintiff suffered sex discrimination that culminated in her discharge.

92. Similarly situated employees were treated more favorably.

93. Defendant, by the actions described herein, discriminated against Plaintiff due to her sex in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e *et seq.*) (hereinafter "Title VII")

WHEREFORE, Plaintiff requests a jury trial and that this Court enter judgment in her favor and against Defendant, declaring that Defendant has engaged in unlawful employment practices with respect to Plaintiff in violation of her rights protected by the Title VII; that Plaintiff be compensated for all losses and damages suffered as a result of Defendant's unlawful discrimination and discharge of Plaintiff, including, but not limited to, past and future lost income, hedonic damages, emotional distress damages, other lost financial benefits of employment, and an amount to compensate Plaintiff for any tax treatment of a damages award; that Defendant be ordered to pay punitive damages; that Plaintiff be awarded pre-judgment and/or post-judgment interest on her damages; that Plaintiff be awarded attorneys' fees and costs reasonably expended on this case; and further relief as this Court deems appropriate under the circumstances.

### COUNT IV –RETALIATION, IN VIOLATION OF THE FAMILY MEDICAL LEAVE ACT

94. Plaintiff incorporates by reference the above paragraphs as if fully set forth herein.

95. Plaintiff engaged in protected activity under the Family Medical Leave Act, 29 U.S.C. § 2601, *et seq.*

96. Plaintiff engaged in activity protected under the FMLA, both by taking leave and by manifesting intent to take future leave.

97. Defendant took materially adverse action against Plaintiff by terminating her employment because of her protected activity under the FMLA.

98. Defendant is an employer bound by the provisions of the FMLA.

99. Plaintiff had worked at least 1200 hours in the preceding 12 months prior to her first termination (upon which the second termination was predicated), entitling her to FMLA rights.

100. Plaintiff was treated less favorably than similarly situated employees who did not exercise their statutory rights.

101. As a direct and proximate result of Defendant's conduct, Plaintiff has sustained and will continue to sustain in the future damages and is entitled to all remedies available to her under the FMLA, including but not limited to diminution in earnings capacity, liquidated damages, lost wages, and other damages yet undetermined.

102. Defendant's conduct was willful and knowing.

WHEREFORE, Plaintiff requests a jury trial and that this Court enter judgment in her favor and against Defendants declaring that Defendants have engaged in unlawful employment practices with respect to Plaintiff in violation of her rights protected by the FMLA; that Plaintiff be reinstated and compensated for all losses and damages suffered as a result of Defendant's unlawful discharge of Plaintiff, including, but not limited to, past and future lost income, liquidated damages, other lost financial benefits of employment, and an amount to compensate Plaintiff for any tax treatment of a damages award (if reinstatement is not a practical or possible remedy then front pay should be that Plaintiff be awarded pre-judgment and/or post-judgment interest on her damages; that

Plaintiff be awarded attorneys' fees and costs reasonably expended on this case; and further relief as this Court deems appropriate under the circumstances.

**COUNT V – DISCRIMINATION BASED ON NATIONAL ORIGIN AND RACE, IN VIOLATION OF SECTION 1981**

103.     Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

104.     The termination of Plaintiff – an adverse employment action – was motivated by her national origin, ethnicity, and/or race, Turkish.

105.     "But for" her ethnicity/national origin/race, Plaintiff would not have been terminated.

106.     Similarly situated employees were treated more favorably than Plaintiff.

107.     Defendant, by the actions described herein, discriminated against Plaintiff due to her ethnicity/national origin/race in violation of her Constitutional guarantees of Equal Protection, as enforced via 42 U.S.C. § 1981.

108.     Section 1981(a) provides that "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens…"

109.     Defendant is an entity bound by Section 1981's dictates and jurisdiction.

110.     The explanations offered by Defendant are demonstrably pretextual.

111.     The conduct of Defendant was outrageous and willfully undertaken with reckless disregard for Plaintiff's rights.

WHEREFORE, Plaintiff requests a jury trial and that this Court enter judgment in her favor and against Defendant, declaring that Defendant has engaged in unlawful employment practices

with respect to Plaintiff in violation of her rights protected by Section 1981; that Plaintiff be reinstated and compensated for all losses and damages suffered as a result of Defendant's unlawful discharge of him, including, but not limited to, past and future lost income, hedonic damages, emotional distress damages, other lost financial benefits of employment, and an amount to compensate Plaintiff for any tax treatment of a damages award (if reinstatement is not a practical or possible remedy then front pay should be awarded); that Defendant be ordered to pay punitive damages; that Plaintiff be awarded pre-judgment and/or post-judgment interest on her damages; that Plaintiff be awarded attorneys' fees and costs reasonably expended on this case; and further relief as this Court deems appropriate under the circumstances.

### COUNT VI - RETALIATION/ILLEGAL DISCHARGE IN VIOLATION OF THE MISSOURI WHISTLEBLOWER PROTECTION ACT, MO. REV. STAT. 285.575

112. Plaintiff hereby incorporates by reference all preceding Paragraphs.

113. MO Rev. Stat. § 285.575 (the "Act") provides that "it shall be an unlawful employment practice for an employer to discharge an individual defined as a protected person in this section because of that person's status as a protected person."

114. Plaintiff reported serious safety-related failures to her employer which was in violation of clear mandates of public policy and § 285.575 making her a "protected person" under the Act.

115. Defendant stepped out of the scope of her defined responsibilities and routine job duties in her complaints.

116. Plaintiff was illegally discharged and retaliated against by Defendant due to her complaints about unsafe business practices being perpetrated by Defendant.

117.    Plaintiff's protected activity played a role in the termination and had a determinative influence.

118.    Plaintiff's termination was clearly pretextual and illegal.

119.    To the extent the Court deems necessary, this Count may be read as in alternative to Count I.

WHEREFORE, Plaintiff respectfully requests judgment, pursuant to verdict by jury, in her favor in an amount that is fair and reasonable for actual damages, back pay, front pay, liquidated damages, interest on damages, for her attorney's costs and fees, and for such other and further relief to which the Court deems just and proper.

        Respectfully Submitted,

        HKM EMPLOYMENT ATTORNEYS LLP

        */s/ Jeffrey D. Hackney*
        Jeffrey D. Hackney
        Missouri Bar No. 53158
        HKM Employment Attorneys, LLP
        7382 Pershing Ave., Suite 1W
        St. Louis, Missouri 63130
        *Telephone/FAX: 314-207-3517*
        *E-Mail: jhackney@hkm.com*
        **Attorney for Plaintiff**